UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| TRUSTEES OF THE MICHIANA AREA ELECTRICAL WORKERS PENSION FUND, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CAUSE NO.: 2:14-CV-244-TLS ) |
| LA PLACE'S ELECTRIC COMPANY, INC., LAPLACE ELECTRIC, INC., and HAROLD OSCAR LAPLACE, Individually and d/b/a LAPLACE ELECTRIC, | ) ) ) ) ) ) |
| Defendants. | ) |

**OPINION AND ORDER**

This matter is before the Court on a Motion for Summary Judgment [ECF No. 32] filed by the Plaintiffs, Trustees of the Michiana Area Electrical Workers Pension Fund. The Plaintiffs filed the Complaint [ECF No. 1] on July 14, 2014, seeking unpaid pension fund withdrawal liability from the Defendants, Harold Oscar LaPlace, La Place's Electric Company, Inc. ("LECI"), and LaPlace Electric, Inc. ("LEI"). The parties commenced the discovery period on December 14, 2014, which ended on October 7, 2015. On December 7, 2015, the Plaintiffs filed this Motion and their Memorandum in Support [ECF No. 33]. On February 1, 2016, the Defendants filed their Response [ECF No. 36]. On February 15, 2016, the Plaintiffs filed their Reply [ECF No. 37]. The Motion is now fully briefed and ripe for ruling.

**BACKGROUND**

The following facts are undisputed. The Plaintiffs are trustees of the Michiana Area Electrical Workers Pension Fund (the "Fund"). They filed this suit against the Defendants under 29 U.S.C. § 1381 of the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"), seeking to obtain unpaid pension fund withdrawal liability from the Defendants. LaPlace, who is

1

81 years old, filed articles of incorporation for LPEC, an Indiana corporation, in 1967. (Resp. to Pls.' First Interrog. ¶ 2, ECF No. 33-1.) He owned and operated LPEC for 43 years as a union shop, "always" utilizing labor from the International Brotherhood of Electrical Workers 153 ("Local 153"), of which he himself was also a member. (*Id.* ¶ 4.) LaPlace wholly owned LECI from its incorporation to its dissolution. (*Id.* ¶ 3.) Over the course of LECI's existence, the entity participated in various collective bargaining agreements ("CBAs") and signed a series of Assent of Participation Agreements ("Participation Agreements") with Local 153. (Sullivan Aff. ¶ 4, ECF No. 33-2.) The Participation Agreements bound LECI to follow the provisions of the CBAs. These provisions included an obligation that LECI make periodic pension fund contributions to the Plaintiffs' fund. (*Id.* ¶ 5; Participation Agreement 1, ECF No. 33-3.) All LECI employees were members of Local 153. (Resp. to Pls.' First Interrog. ¶ 2.)

Around 2006–2007, LaPlace began experiencing financial difficulty. He was unable to secure Local 153's and the Fund's increase in their bond requirement (from $10,000 to $40,000). With consent of Local 153 and the Fund, LaPlace established a line of credit in lieu of the bond. He continued to contribute to the Fund, but eventually was unable to make his required contributions. In 2010 LECI ceased operations. (Resp. to Pls.' First Interrog. ¶ 2(d).) And on or about March 19, 2010, LECI was administratively dissolved by the Indiana Secretary of State. (Resp. to Pls.' Req. for Admis. ¶ 2, ECF No. 33-11.) LECI paid contributions to the Fund until September 2010. (Sullivan Aff. ¶ 7.) LECI did not pay contributions to the Fund for any period of time after the September 2010 contributions were paid. (Resp. to Pls.' Req. for Admis. ¶ 3.) Thereafter, the Fund determined that LECI withdrew its participation during the plan year ending June 30, 2011. (Sullivan Aff. ¶¶ 9–10.)

But after LaPlace dissolved LECI, he filed articles of incorporation for a new entity, LEI, also an Indiana corporation, with the Secretary of State in 2011. (Resp. to Pls.' Req. for Admis. ¶ 2.) Like LECI, LaPlace also wholly owned and operated LEI. *(Id.* ¶¶ 5, 9.) In addition, LaPlace continued to employ his son, Bud LaPlace, who resigned his union membership at Local 153 in 2010, the same year that LaPlace dissolved LECI. LEI is a non-union shop and not a signatory to the CBA or Participation Agreements with Local 153 like LECI was.

But the Fund and Local 153 soon became aware that LaPlace was still performing electrical contracting work in its jurisdiction even after he had dissolved LECI. The Fund took steps to determine LECI's withdrawal liability for having continued to perform covered work as LEI, work that would require Fund contribution. The Fund's administrator, TIC International Corporation requested Cheiron, Inc., the Fund's actuarial firm, to prepare actuarial calculations. Cheiron assessed the total withdrawal liability amount at $246,910.00, at 13 quarterly payments of $19,330.00 and a final payment of $17,169.00 (Cheiron Assessment 1, ECF No. 33-24.) On February 25, 2011, the Fund notified LECI of its continued obligation to pay withdrawal liability because it continued to operate in the electrical contracting industry as LEI.

In February 2013, Stanley Miles, Local 153's business agent and membership development coordinator, reviewed the electrical contracting permit database for the City of Mishawaka, Indiana, and discovered a permit issued to LEI on February 21, 2013. (Miles. Aff. ¶ 9, ECF No. 33-12). On March 15, 2013, Miles took his investigation to the Mishawaka CVS as part of his official duties for Local 153 and discovered Bud performing electrical work there. Bud confirmed to Miles that he was "working for [his] dad." (*Id.* ¶ 10.) Miles continued to

3

monitor the Mishawaka electrical contractor permitting database thereafter, and found permits issued to LEI through October 23, 2015.[1]

On October 15, 2013, the Fund's attorney sent a letter to LECI's attorney, reaffirming a demand for payment, with the deadline of November 1, 2013 for LECI to make its first quarterly payment. When LECI failed to pay, the Fund's attorney sent another letter to LECI's attorney, notifying him that LECI was in default, and provided him with an opportunity to cure, pursuant to ERISA § 4219(c)(5).

LECI admits that it did not request review of the withdrawal liability assessment pursuant to ERISA § 4219(b)(2)(A). LECI also admits it did not initiate arbitration within the deadlines set forth in ERISA § 4219(b)(2).

## DISCUSSION

### A. Legal Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. A court has one task

---

[1] Besides discovering the permit for February 21, 2013, Miles discovered periodic Mishawaka permits issued to LEI for the following dates: April 5, 2013; April 12, 2013; July 9, 2013; July 22, 2013; July 2, 2014; July 31, 2014; two permits for September 23, 2014; October 3, 2014; October 10, 2014; two permits for July 24, 2015; and October 23, 2015. (Miles Aff. ¶¶ 8–17.) In his affidavit, Miles concludes that these permits reveal only a "sampling" of work LEI has performed and believes LEI has operated in other cities and towns. (*Id.* ¶ 18.)

and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

**B.     Analysis**

**1.     *Assessed Withdrawal Liability and Arbitration***

The parties agree that the Fund is a multiemployer pension plan governed by ERISA and the MPPAA. The Court therefore has proper jurisdiction over the matter. *Hays v. Bryan Cave LLP*, 446 F.3d 712, 713–14 (7th Cir. 2006). In 1974, Congress enacted ERISA, 29 U.S.C. § 1001 *et seq.*, to regulate private pension and health plans. Multiemployer plans are pensions "to which more than one employer is required to contribute" and that "[are] maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer." 29 U.S.C. § 1002(37)(A). "These plans allow workers to change jobs while retaining their pension benefits, which are not tied to one particular employer." *Laborers' Pension Fund v. W.R. Weis Co. Inc.*, 180 F. Supp. 3d 540, 548 (N.D. Ill. 2016).

To guarantee the stability of unfunded plans, the MPPAA requires any employer that partially or completely withdraws from a plan to pay for its share of unfunded vested plan benefits. 29 U.S.C. § 1381. This obligation is called "withdrawal liability," which "protect[s] employers in the multi-employer plan from having to pay for those benefits." *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994). Congress

added the MPPAA amendments in 1980 "to cure the problems arising when an employer ceased making payments to a pension plan fund," leaving "the plan . . . with vested pension obligations which were only partially funded." *Robbins v. Lady Balt. Foods, Inc.*, 868 F.2d 258, 261 (7th Cir. 1989). Without withdrawal liability, Congress believed that the "added burdens upon employers who remained as participants in plans might induce more of them to remove themselves from multiemployer plans. This process could discourage the entry of new participants and precipitate the financial failure of less stable plans." *Peick v. Pension Benefit Guar. Corp.*, 724 F.2d 1247, 1255–56 (7th Cir. 1983).

The MPPAA provides that an employer executes a complete withdrawal from a plan when it "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(b)(1). But there is an exception for the building and construction industry that is designed to treat construction employers "more generously than most other employers under the MPPAA." *Ceco Concrete Const., LLC v. Centennial State Carpenters Pension Tr.*, 821 F.3d 1250, 1254 (10th Cir. 2016). For this industry, an employer owes withdrawal liability when

> (A)  [the] employer ceases to have an obligation to contribute under the plan, and
> (B)  the employer—
> (i) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or
> (ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

29 U.S.C. § 1383(b)(2). The Ninth Circuit has explained that the construction-industry exception "impos[es] withdrawal liability only when a contractor's obligation to the fund cease[s] *and* the contractor continue[s] doing covered work." *H.C. Elliot, Inc. v. Carpenters Pension Tr. for N.*

6

*Cal.*, 859 F.2d 808, 811 (9th Cir. 1988) (emphasis added). Building and construction companies that leave the industry altogether do not have liability "because the construction industry as a whole does not necessarily shrink when a contributing contractor leaves the industry; employees are often dispatched to another contributing contractor." *Id.* (citation omitted).

Thus, only an industry employer that leaves the industry and then continues performing covered work pursuant to § 1383(b)(2) may be assessed withdrawal liability by the pension fund it contributes to. *Laborers' Pension Fund*, 180 F. Supp. 3d at 548. And for the purposes of the MPPAA, an employer can be more than one entity. All "trades or businesses" under "common control" are treated as constituting a single employer for purposes of determining withdrawal liability. 29 U.S.C. § 1301(b)(1); *Cent. States Se. & Sw. Areas Pension Fund. v. Schilli Corp.*, 420 F.3d 663, 666–68 (7th Cir. 2002).

It is undisputed that Defendant LaPlace ceased operating and dissolved LECI—which he wholly owned—after LECI faced financial difficulty in the electrical contracting industry in 2011. Soon after, LaPlace incorporated LEI, which he also wholly owned and operated. This new entity performed the same electrical contracting work that LECI performed and was under the same ownership.[2] A common-control group "continues to perform [covered] work" under the statute if the group continues operating without interruption after the obligation to contribute ceases. *Trs. of Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Leaseway Transp. Corp.*, 76 F.3d 824, 829 (7th Cir. 1996). Thus, under the MPPAA, LECI continued to perform covered work for which it would be liable to pay its share of pension obligations to the Fund.

---

[2] The Court evaluates separately whether LECI and LEI are jointly and severally liable.

The Fund became aware of LEI's electrical contracting activity and notified the Defendants that it would pursue recourse. On February 11, 2011, the Fund issued LECI a letter, informing LECI of its continuing pension contribution obligation. On October 15, 2013, the Fund's attorney sent a letter to LECI's attorney, reaffirming a demand for payment, with the deadline of November 1, 2013 for LECI to make its first quarterly payment. LECI failed to make payment. The Fund's attorney then sent a letter to LECI's attorney, notifying him that LECI was in default, and provided him with an opportunity to cure, pursuant to ERISA § 4219(c)(5).

Under the MPPAA "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 . . . shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1). The MPPAA "gives an employer 90 days to ask a pension plan to review its decision." *Cent. States, Se. & Sw. Areas Pension Fund v. Allega Concrete Corp.*, 772 F.3d 499, 500 (2014) (citing 29 U.S.C. § 1399(b)(2)(A)). "If the plan adheres to the original decision—or if it does not act within 120 days—the employer has a further 60 days to seek arbitration." *Id.* (citing 29 U.S.C. § 1401(a)(1)). "If arbitration [is] not sought within the time period required by 29 U.S.C. § 1401(a)(1), the amount demanded by the pension plan sponsor is due and owing." *Trs. of Chi. Truck Drivers Pension Fund v. Cent. Transp., Inc.*, 888 F.2d 1161–64 (7th Cir. 1989).

Here, LECI did not partake in the grievance process it was entitled to until this suit commenced. The Defendants admit that they did not request review of the withdrawal liability assessment pursuant to ERISA § 4219(b)(2)(A). The Defendants also admit that they did not initiate arbitration within the deadlines set forth in ERISA § 4219(b)(2). Because LECI did not timely challenge the withdrawal liability assessment or initiate an arbitration proceeding as

required under 29 U.S.C. § 1401(a)(1), the Court finds that LECI is "due and owing" the Fund for the full withdrawal liability amount assessed. *See Id.* at 1163.

**2.      *Common Control***

The Court next considers whether LECI's liability amount extends to LEI jointly and severally. Under 29 U.S.C. § 1301(b)(1), withdrawal liability may become joint and several when a plaintiff establishes that entities are (1) involved in the same "trade or business" and (2) under "common control." *Cent. States Se. and Sw. Areas Pension Fund v. Pers., Inc.*, 974 F.2d 789 (7th Cir. 1992). For an activity to be a trade or business, an entity "must engage in the activity: (1) for the primary purpose of income or profit; and (2) with continuity and regularity." *Cent. States, Se. & Sw. Areas Pension Fund v. Neiman*, 285 F.3d 587, 594 (7th Cir. 2002) (citing *Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987)).

Here, LaPlace admits to filing articles of incorporation in 2011 for LEI, after he dissolved LECI. LaPlace also admits he began operating LEI as an electrical contracting business in 2011, and continues to operate it. LEI also admits to engaging in trade and business activities for the primary purpose of income and profit. Miles's observations are also undisputed. He saw LEI operate in Granger, Indiana and monitored LEI's business activity by accessing permits issued by the City of Mishawaka to LEI from early 2013 to October 2015. The Court finds that the Plaintiffs have established that LECI and LEI are entities involved in the same trade or business and under the same common control.[3] The Court therefore finds LECI and LEI jointly and severally liable for the Fund's assessed withdrawal liability amount.

---

[3] The Plaintiffs alternatively raise the theory of successor liability to establish that LEI is jointly and severally liable with LECI. "[S]ucessor entities can be liable for multiemployer pension contributions if (1) there is sufficient continuity between the two companies and (2) the successor company had notice of the predecessor's liability." *Moriaty v. Svec*, 164 F.3d 323, 327 (7th Cir. 1998) (citations omitted). The notice requirement can be proven "from a variety of circumstances, such as common control." *Sullivan v.*

### 3. *Personal Liability*

The Court has found that LECI and LEI are jointly and severally liable for the Fund's assessed withdrawal liability for the purposes of the withdrawal liability amount, but the Court separately considers whether LaPlace himself is personally liable for that assessed total. An individual can be held "personally liable [under ERISA law] when he holds the entire interest in an *unincorporated* 'trade or business' under common control with the withdrawing employer," *Cen. States, Se. & Sw. Pension Fund v. Nagy*, 714 F.3d 545, 549 (7th Cir. 2013) (emphasis added). Although common control may be "obvious; the key question is whether [an individual] engaged in an unincorporated 'trade or business' within the meaning of § 1301(b)(1)." *Id.*

The Fund has established that LECI and LEI are under common control and are due and owing on their assessed withdrawal liability. But the Fund has not developed the record specifically on the issue of whether LaPlace is personally liable. The Fund does not argue that LaPlace individually engaged in unincorporated trade or business activity within the meaning of § 1301(b)(1) that would attach personal liability to him. *Cf. Id*. at 549–52 (defendant was personally liable where both his leasing arrangement with the liable defendant-owned company and his independent contractor services to a non-liable entity for which he was a shareholder of qualified as unincorporated trade or business within the meaning of § 1301(b)(1)). Because the record is undeveloped on this issue, summary judgment on whether LaPlace is personally liable for the assessed withdrawal liability amount is denied.

---

*Running Waters Irrigation*, 739 F.3d 354, 357 (7th Cir. 2014) (citations omitted). The Court finds that the Plaintiffs have established successor liability for LEI for the purpose of withdrawal liability amount under this theory as well because the facts show both continuity and the successor entity had notice.

**4.** *Equitable Estoppel*

The Defendants lastly assert that the Plaintiffs are equitably estopped from seeking withdrawal liability because Michael Compton—President of Local 153 and Fund committee member—allegedly suggested on several instances to LaPlace that he shut down LECI and open a new electrical service provider business that would not be subject to the CBA or Participation Agreements. The Plaintiffs and Compton dispute the Defendants' account of events. "[A] court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor." *See Bellaver*, 200 F.3d at 491–92. Thus, the Court assumes the veracity of the Defendants' contentions here for the purposes of summary judgment.[4]

The Seventh Circuit has not definitively made estoppel available for employers contributing to multiemployer plans. *Cf. Black v. TIC Investment Corp.*, 900 F.2d 112, 115 (7th Cir. 1990) (estopping employer in single employer plan context). In *Teamsters & Employers Welfare Tr. of Illinois v. Gorman Bros. Ready Mix*, 283 F.3d 877 (7th Cir. 2002), the Seventh Circuit held that an employer could assert a laches defense in a multiemployer-plan action, although the employer in that case did not ultimately succeed because it could not show reliance. *Id.* at 883. The court explained that "laches and equitable estoppel are interchangeable" because "conduct claimed to create an estoppel consists mainly of delay that gives the defense a laches flavor, since laches means delay." *Id.* at 882. However, since *Gorman Brothers*, it is unclear whether the circuit has definitively held that equitable estoppel is available in cases involving withdrawal liability in multiemployer plans. *See, e.g.*, *Hancock v. Ill. Cent. Sweeping LLC*, 73 F. Supp. 3d 932, 943 (N.D. Ill. 2014) (explaining that "[the Seventh Circuit] has not yet, as far as

---

[4] The Plaintiffs have pressed the argument that the Defendants have waived their right to equitable estoppel because LECI did not seek review of the withdrawal liability assessment and did not seek arbitration. The Court declines to consider this argument because the Court finds for the Plaintiffs on other grounds.

11

the court can tell, explicitly approved [the] use [of equitable estoppel] as an affirmative defense in an action brought by a multiemployer plan," but considering the defense because the plaintiff did not object); *see also Laborers' Pension Fund*, 180 F. Supp. 3d at 556 (discussing cases).

But assuming estoppel is afforded to the Defendants, they have not adequately presented the defense. *See Cent. States, Se., Sw. Areas Pension Fund v. Kroger Co.*, 226 F.3d 903, 914 (7th Cir. 2000) ("This circuit has not decided whether estoppel claims should be available in ERISA actions involving multi-employer, funded plans. . . . [But] even assuming that estoppel could be available in this context . . . [the defendant] cannot make out the elements of estoppel. . . ."). The Seventh Circuit in *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579 (7th Cir. 1999), has firmly restated the elements for all "arcane 'varieties' of estoppel under ERISA." *Id.* at 585. In this Circuit, a cause of action for any type of estoppel in an ERISA context must have four elements: "(1) knowing misrepresentation; (2) made in writing; (3) with reasonable reliance on that misrepresentation by the plaintiff; (4) to her detriment." *Id.* at 585; *Trustmark Life Ins. Co. v. Univ. of Chi. Hosp.*, 207 F.3d 876, 883 (7th Cir. 2000) ("Although the definition and elements of 'estoppel' in the ERISA context have been varied, the court in *Coker* noted that four elements must always be present. . . .") (first citing *Coker*, 165 F.3d at 585; then citing *Black*, 900 F.2d at 115); *see also Cent. States, Se., Sw. Areas Pension Fund*, 226 F.3d at 914 (citing *Coker*).

The Defendants state in LaPlace's affidavit that Compton is both "local union President and Pension Fund Committee Member." (LaPlace Aff. ¶ 10, ECF No. 36-1.) In their Reply, the Defendants describe Compton as the "local union President (and Pension Fund/Trustee Representative)." [5] (Reply 2, ECF No. 36.) It is somewhat unclear from the record and briefing

---

[5] Plaintiffs point to this latter admission to argue that it would be unreasonable for the Defendants to have detrimentally relied on Compton's statements as the official position of all of the Funds' trustees, because the Defendants were explicitly aware that there was a committee of trustees ultimately responsible for any decisions. *See Moriarty v. Muzyka*, 379 F. Supp. 2d 935, 950 (N.D. Ill. 2005) ("no[]

the scope of Compton's position as a Fund committee member, and whether he is a trustee. LaPlace asserts in his affidavit that Compton "told [him he] should just retire or start another electrical business that would not be under a CBA or any pension funding obligations" and that "[he] relied on [Compton's] statements and started a new business in 2011." (LaPlace Aff. ¶¶ 14–15, ECF No. 36-1.) But nowhere in the record do the Defendants importantly contend the element that the alleged misrepresentations were made in writing, a requirement of the Circuit to pursue an equitable estoppel claim under ERISA. Therefore, the Court declines to apply an equitable estoppel defense here.

## CONCLUSION

For the forgoing reasons, the Plaintiffs' Motion for Summary Judgment [ECF No. 32] is GRANTED IN PART in holding that La Place's Electric Company, Inc., and LaPlace Electric, Inc., owe withdrawal liability jointly and severally to the Plaintiffs. The Motion is DENIED IN PART in holding that Harold Oscar LaPlace is personally liable.

SO ORDERED on February 15, 2017

s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION

---

reasonable person" would have believed that a union official and trustee of a pension fund whom agreed to refer to the entire board a request to waive the defendant's contributions, was in fact waiving those contributions himself).